# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

————————————

HEATHER SCHROEDER and MISTY TANNER,

*Plaintiffs-Appellees*,

v.

PROGRESSIVE PALOVERDE INSURANCE COMPANY and PROGRESSIVE SOUTHEASTERN INSURANCE CO.,

*Defendants-Appellants*.

————————————

On Appeal from the United States District Court for the Southern District of Indiana, No. 1:22-cv-00946-JMS-MKK, The Honorable Jane Magnus-Stinson

————————————

## CORRECTED RESPONSE BRIEF

## – FILED UNDER SEAL –
————————————

Jacob L. Phillips
JACOBSON PHILLIPS PLLC
478 E. Altamonte Drive
Suite 108-570
Altamonte Springs, FL 32701
407-720-4057
jacob@jacobsonphillips.com

Lee Lowther
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
(501) 312-8500
hbates@cbplaw.com
llowther@cbplaw.com

*Counsel for Plaintiffs-Appellees*

July 22, 2024

Save As          Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1559

Short Caption: Heather Schroeder, et al v. Progressive Paloverde Insurance Company, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Heather Schroeder, Misty Tanner, and the Certified Class

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Jacobson Phillips PLLC, Carney Bates & Pulliam, Shamis & Gentile, Normand PLLC, Cohen & Malad

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and
        **N/A**

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
        **N/A**

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
  **N/A**

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
  **N/A**

Attorney's Signature: /s/Jake Phillips                    Date: 7/1/2024

Attorney's Printed Name:  Jacob L. Phillips

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ✔     No ☐

Address:  478 E. Altamonte Dr., Ste 108-570, Altamonte Springs, Florida 32701

Phone Number: 407-720-4057                         Fax Number:

E-Mail Address: jacob@jacobsonphillips.com

rev. 12/19 AK

i

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1559

Short Caption: Heather Schroeder, et al v. Progressive Paloverde Insurance Company, et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Heather Schroeder, Misty Tanner, and the Certified Class

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Jacobson Phillips PLLC, Carney Bates & Pulliam, Shamis & Gentile, Normand PLLC, Cohen & Malad

(3)     If the party, amicus or intervenor is a corporation:

     i)     Identify all its parent corporations, if any; and

         N/A

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/Lee Lowther        Date: 7/1/2024

Attorney's Printed Name: Lee Lowther

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: One Allied Drive, Suite 1400, Little Rock, Arkansas 32202

Phone Number: 501-312-8500        Fax Number: 501-312-8505

E-Mail Address: llowther@cbplaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................v

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES.......................................................................1

STATEMENT OF THE CASE...........................................................................1

A.  Statement of the Facts ..............................................................................3

    1.  Progressive's Form Policies and Uniform Procedures ..................3

    2.  Progressive's Total Loss Valuation Methodology.........................3

    3.  Imposing a PSA is Inconsistent with Market Realities and Appraisal Standards .................................................................................................5

    4.  To Calculate the PSA, Progressive Ignores and Deletes Market Data That Disproves Its Market Theory ...........................................7

B.  Course of Proceedings................................................................................11

SUMMARY OF ARGUMENT ..........................................................................11

STANDARD OF REVIEW ...............................................................................18

ARGUMENT ......................................................................................................19

I.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING COMMON ISSUES PREDOMINATE............................................19

    a.  The district court did not abuse its discretion in finding that it is more likely than not that common evidence can be used to establish whether class members have Article III standing and that Progressive breached its contract. ...................................................................................................20

    b.  Article III..............................................................................................21

    c.  Liability ................................................................................................22

    d.  The district court did not abuse its discretion in finding that individualized vehicle valuations—which have already occurred and are not contested—do not predominate over common questions. ...........................................24

    e.  The district court did not abuse its discretion in finding that Progressive's manipulation and exclusion of data contributes to finding that common issues are likely to predominate. ...................................................................37

f.    Plaintiff was not required to prove that her evidence of ACV is the only evidence of ACV ........................................................................43

II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THERE WERE COMMON QUESTIONS WITHIN THE MEANING OF RULE 23(A)(2) ..........................................................................47

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING PLAINTIFF IS ADEQUATE AND THERE ARE NO DISQUALIFYING INTRACLASS CONFLICTS ....................................................52

CONCLUSION ......................................................................55

CERTIFICATE OF COMPLIANCE ..................................................57

CERTIFICATE OF SERVICE ........................................................587

## TABLE OF AUTHORITIES

**Cases**

*Ambrosio v. Progressive Preferred Ins. Co.*,
  2024 U.S. Dist. LEXIS 36963 (D. Ariz. Mar. 4, 2024).........................................37

*Ambrosio v. Progressive Preferred Ins. Co.*,
  No. 24-1633 (9th Cir. Apr. 26, 2024) ..................................................................13

*Ariz. St. Leg. v. Ariz. Indep. Redistricting Comm'n*,
  135 S. Ct. 2652 (2015)........................................................................................20

*Arreola v. Godinez*,
  546 F.3d 788 (7th Cir. 2008) ...............................................................................20

*Brown v. Progressive Mountain Ins. Co.*,
  2024 WL 399479 (N.D. Ga. Feb. 1, 2024).............................................. 23, 28, 30

*Brown, et al.  v. Progressive Mountain Ins. Co., et al.*,
  2023 U.S. Dist. LEXIS 136472 (N.D. Ga. Aug. 3, 2023) ................ 12, 13, 42, 54

*Chadwick v. State Farm Mut. Auto. Ins. Co.*,
  2024 U.S. Dist. LEXIS 47154 (E.D. Ark. Mar. 18, 2024) ...................... 12, 23, 38

*Clippinger v. State Farm Mut. Auto. Ins. Co.*,
  2023 U.S. Dist. LEXIS 153813 (W.D. Tenn. Aug. 25, 2023)...................... passim

*Conrad v. Boiron, Inc.*,
  869 F.3d 536 (7th Cir. 2017) ...............................................................................56

*Costello v. Mountain Laurel Assurance Co.*,
  2024 U.S. Dist. LEXIS 11283 (E.D. Tenn. Jan. 22, 2024) .......................... 12, 31

*Curran v. Progressive Direct Ins. Co.*,
  345 F.R.D. 498 (D. Colo. 2023) ................................................................. passim

*Curtiss-Wright Corp. v. General Elec. Co.*,
   446 U.S. 1 (7th Cir. 1980) ............................................................ 18, 19

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ................................................................53

*Drummond v. Progressive Specialty Ins. Co.*,
   2023 U.S. Dist. LEXIS 140205 (E.D. Pa. Aug. 11, 2023) ............... 12, 31, 35, 54

*Eddlemon v. Bradley Univ.*,
   65 F.4th 335 (7th Cir. 2023) ........................................................ 19, 48

*Freeman v. Progressive Direct Ins. Co.*,
   2024 U.S. Dist. LEXIS 83402 (D.S.C. May 8, 2024) ........................... 12, 32, 54

*Gates v. Towery*,
   430 F.3d 429 (7th Cir. 2005) ................................................................21

*Gildon v. Astrue*,
   260 F. App'x 927 (7th Cir. 2008).........................................................20

*Hicks v. State Farm Fire & Cas. Co.*,
   965 F.3d 452 (6th Cir. 2020) ........................................................ 35, 36

*Howland v. First Am. Title Ins. Co.*,
   672 F.3d 525 (7th Cir. 2012) ................................................................25

*Huber v. Simon's Agency, Inc.*,
   84 F.4th 132 (3d. Cir. 2023) ................................................................25

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
   317 F.R.D. 675 (N.D. Ga. 2016) .........................................................51

*Johnson v. Meriter Health Servs. Emple. Ret. Plan*,
   702 F.3d 364 (7th Cir. 2012) ................................................................55

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
  634 F.3d 883 (7th Cir. 2014) ........................................................ 25, 26

*Kress v. CCA of Tenn., LLC*,
  694 F.3d 890 (7th Cir. 2012) ............................................................18

*Kroeger v. Progressive Universal Ins. Co.*,
  2023 U.S. Dist. LEXIS 231824 (S.D. Iowa Nov. 20, 2023) ...............37

*Lara v. First Nat'l Ins. Co. of Am.*,
  25 F.4th 1134 (9th Cir. 2022) .................................................... passim

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ...................................................... 18, 56

*Mitchell v. State Farm Fire & Cas. Co.*,
  954 F.3d 700 (5th Cir. 2020) ...................................................... 35, 36

*Ngethpharat v. State Farm Mut. Auto. Ins. Co.*,
  2022 WL 1404526 (W.D. Wash. May 4, 2022) ........................... 29, 32

*Prudhomme v. GEICO*,
  2022 U.S. App. LEXIS 4599 (5th Cir. Feb. 21, 2022)........................55

*Puffer v. Allstate Ins. Co.*,
  675 F.3d 709 (7th Cir. 2012) .............................................................55

*Retired Chicago Police Ass'n v. City of Chicago*,
  7 F.3d 584 (7th Cir. 1993) .................................................................53

*Reynolds v. Progressive Direct Ins. Co.*,
  2024 U.S. Dist. LEXIS 63031 (N.D. Ala. Apr. 3, 2024)............... passim

*Sampson v. United Servs. Auto. Ass'n*,
  83 F.4th 414 (5th Cir. 2023) ........................................... 32, 33, 45, 46

*Schleicher v. Wendt*,
    618 F.3d 679 (7th Cir. 2010) ........................................................ 42, 51

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ............................................................................18

*Signor v. Safeco Ins. Co. of Illinois*,
    72 F.4th 1223 (11th Cir. 2023) ........................................................6, 15

*Smith v. Hunt*,
    707 F.3d 803 (7th Cir. 2013) ........................................................ 18, 19

*Smith v. S. Farm Bureau Cas. Ins. Co.*,
    18 F. 4th 976 (8th Cir. 2021) ........................................... 15, 22, 41, 50

*Stuart v. State Farm Fire & Cas. Co.*,
    910 F.3d 371 (8th Cir. 2019) ........................................... 28, 35, 36, 38

*Tarrify Props., LLC v. Cuyahoga County*,
    37 F.4th 1101 (6th Cir. 2022) ...........................................................37

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ......................................................................21

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ..........................................................................48

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ..........................................................................29

*United States v. Dingwall*,
    6 F.4th 744 (7th Cir. 2021) ...............................................................18

*United States v. Glecier*,
    923 F.2d 496 (7th Cir.), *cert. denied*, 502 U.S. 810 (1991) ..................19

*United States v. Thomas*,
   453 F.3d 838 (7th Cir. 2006) ........................................................ passim

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ..............................................................54

*Volino v. Progressive Cas. Ins. Co.*,
   2023 U.S. Dist. LEXIS 44666 (S.D.N.Y. Mar. 16, 2023) ........................... passim

*Wal-Mart Stores, Inc. v. Visa USA Inc.*,
   280 F.3d 124 (2d Cir. 2001) ..................................................................53

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
   208 F.3d 288 (1st Cir. 2000) ..................................................................47

**Rules**

Fed. R. Civ. P. 23 .................................................. 17, 18, 20, 42, 48
Fed. R. Civ. P. 23(a) ........................................................................11
Fed. R. Civ. P. 23(a)(4) ....................................................................53
Fed. R. Civ. P. 23(b)(2) .............................................................. 25, 26
Fed. R. Civ. P. 23(b)(3) ........................................................ 11, 16, 25, 56

## JURISDICTIONAL STATEMENT

Plaintiff-Appellee agrees this Court has jurisdiction.

## STATEMENT OF THE ISSUES

1.     Whether the district court abused its discretion by holding—consistent with nine other courts—that common questions predominate, where Plaintiff introduced common evidence showing Progressive breached its contractual obligation to pay actual cash value ("ACV") as "determined by market value, age, and condition" by applying an invented "negotiation" deduction predicated on manipulated data and demonstrably false assumptions which resulted in an underpayment of ACV?

2.     Whether the district court abused its discretion by focusing its predominance and commonality analysis on the validity of the PSAs, where Plaintiff's common evidence shows that applying the PSAs meant Progressive failed to determine ACV based on "market value" but instead based on an artificially deflated false market, resulting in an underpayment of ACV?

3.     Whether the district court abused its discretion by finding Plaintiff is an adequate class representative where, if Plaintiff succeeds on the merits, every single member of the Class will receive a monetary damages payment?

## STATEMENT OF THE CASE

This *case* (we'll get to this appeal in a second) concerns whether Progressive paid the actual cash value (ACV) of totaled vehicles, and whether its calculation of

ACV was "determined" by market value, age, and condition. Overwhelming empirical evidence shows, in this modern, Internet-driven market, that used autos typically sell for list price—millions of transactions show that vehicles typically sell for list price, whether measured as median, mode, or mean. Expert testimony confirms used autos are priced to market, and that while it is of course the case that vehicles sometimes sell for below market value—because some purchasers are entitled to special discounts (friends/family, employee, military, etc.), some are excellent negotiators who can secure below-market deals, some finance through the dealership, allowing them to shift profits based on points on the loan, some buyers have trade-ins that incentivize dealers to sell at below-market prices, etc.—this has nothing to do with the actual cash market value of the used auto. Faced with this reality—which even its own data confirms—Progressive was unsatisfied, and chose to simply *delete and manipulate its data*.

Why? To apply a projected sold adjustment (PSA), which allowed Progressive to deduce its payment to Class Members to the tune of tens of millions of dollars. Plaintiff presented evidence—the deletion of data, the expert testimony about how the used auto market actually works—demonstrating this practice was illegitimate. Plaintiff presented evidence that, otherwise, Progressive's individual valuation of vehicles is sound and reliable. And absent class members could rely on that same exact evidence were they to bring an individual case. That's why the district court

and nine others found class treatment is appropriate. Which brings us to the issue in this *appeal*. Did the district court abuse its discretion in finding, consistent with nine other courts, the evidence further outlined below is evidence upon which class members could rely were they to bring an individual case and, thus, common issues predominate? It did not.

### A.     Statement of the Facts

### 1.  Progressive's Form Policies and Uniform Procedures

Progressive uses form insurance policies with identical language. ECF No. 93-2 ("Retton Dep.") at 27-30.[1] In its Policy, Progressive limits its liability by stating insureds with a total loss will be compensated the ACV of their vehicle and states ACV will be determined by the "market value, age, and condition" of the vehicle. ECF No. 29-1 at 24-25 ("Policy"). Plaintiff and Class Members experienced a total loss. ECF No. 93-3 at 28, 31 ("Silver Dep."). Consistent with its Policy terms, Progressive's uniform practice is to base total-loss payments on Mitchell's appraisal of the vehicle's ACV. At issue is the one element of that appraisal, unlike every other element, that systematically, and invariably, reduces the appraised value.

### 2.  Progressive's Total Loss Valuation Methodology

---

[1] Citations to ECF No. ____ are to the public or sealed record. Citations to "IB" are to Progressive's initial brief.

Progressive uses a third-party company, Mitchell, to generate valuation reports ("Reports" or "Valuation Reports") to value total-loss vehicles. Retton Dep. at 38-39, 56-60. After an adjuster inputs the vehicle information, the Report is generated through Mitchell's WCTL platform. *Id.* at 38-39, 43-44; also ECF No. 93-4 ("Kroell Dep.") at 30-31. Progressive used WCTL Reports as its default method of calculating ACV. Retton Dep. Retton Dep. at 43-44, 56-60.

These appraisal Reports start with identifying the list price of comparable vehicles. *Id.* at 38, 52, 60. Then, Progressive, through its chosen company, Mitchell, applies a PSA to list prices, purportedly to "reflect consumer purchasing behavior (negotiating a different price than the list price)." *Id*. 43-44, 76; *see also* ECF 59-2 at 12 (Plaintiff's Report). In other words, Progressive's position is car dealerships uniformly price vehicles above market and negotiate down to the actual market value—thus, according to Progressive, the advertised prices must be reduced by a PSA of (on average) ▮%. ECF No. 93-5 ("Lacey Report") at 13. The new "price"— reduced by the PSA—of each comp vehicle is adjusted based on observed and documented differences, if any, in mileage or equipment. Kroell Dep. at 143-144.

The average of the adjusted prices is the vehicle's "base" market value. *Id.* at 145-146. From there, Mitchell adjusts the base market value amount based on the total-loss vehicle itself—if Progressive's adjusters found the total-loss vehicle was in below- or above-average condition, for example—which establishes what

4

Progressive represents is the vehicle's adjusted market value. *Id.* at 146. Finally, any taxes, fees, and deductible are automatically applied, which becomes the ultimate claim payment amount. Retton Dep., at 75. Progressive maintains this data in its electronic claims file system. Lacey Report, at 9-12.

### 3. Imposing a PSA is Inconsistent with Market Realities and Appraisal Standards

Progressive's assertion that list prices of comparable vehicles are bloated and consumers routinely negotiate advertised prices down is belied by market realities. Plaintiff's industry expert, Kirk Felix, explains Progressive's position is an outdated and false characterization of the market. ECF No. 93-6 ("Felix Report") at 3-5. Many years prior to the Class Period, it was perhaps a fair characterization of market forces: Without Internet advertising and sophisticated pricing tools, the "sticker" price was not really a factor—consumers went to the local dealership with the desired vehicle type and could not easily compare prices across numerous dealerships. *Id.* Now, not only can dealers identify the precise amount at which comparable vehicles are listed, but so too can consumers—and if the dealership prices above market, consumers will patronize competing dealerships who price to market. *Id.*

This does not mean vehicles invariably sell for the precise listed price—there are numerous reasons unrelated to actual cash market value why vehicles sell for

less or more than market price. For example, a dealership might *sell* a vehicle for less than market price if, *inter alia*, (i) they are getting points on a loan; (ii) there is a special discount (military, employee, friends/family); (iii) a consumer is entitled to apply a "credit" earned through use of the service department; or (iv) the purchaser had an attractive trade-in that incentivized the dealership to sell at a below-market price so as to obtain the trade-in vehicle. *Id.* at 7-9. But these reasons are unrelated to the actual market price (or *value*) of a vehicle. *Id.*; *see also Signor v. Safeco Ins. Co. of Illinois*, 72 F.4th 1223, 1231 (11th Cir. 2023) (explaining an insurer properly used list price, not "projected" sale price, in calculating ACV because there are "many factors affecting a vehicle's sale price that *do not affect [its] value*" one of which is that "the buyer was a particularly good negotiator") (emphasis added).

These market realities are reflected in appraisal standards. Plaintiff's appraisal expert explains the "comp" methodology Progressive utilizes is essentially a line-item method to arrive at the ACV of damaged property, pursuant to which appraisers take the list prices of comp vehicles and make line-item adjustments for documented differences between the comparable vehicle(s) and insured vehicle in mileage, equipment, and condition. ECF No. 96-9 at 4-6 ("Merritt Report"). Any adjustment must be based on observed, documented, and verifiable data. *Id*. Other than the PSA, Mitchell's method is consistent with this standard and documents a detailed, sound,

and reliable appraisal of each loss vehicle that Progressive presents to the insured as ACV. *Id.* at 8–10.

But Progressive deviated from proper appraisal standards in applying the PSA. *Id.* at 6–10. Because the PSA is not based on observed, verified data, it is necessarily arbitrary and inconsistent with proper appraisal standards. *Id.* at 6–7. As Merritt explains, the proper method for identifying a vehicle's ACV is to take the average price of comparable vehicles, adjusted for documented differences in mileage, condition, and equipment. *Id.* at 4–5. As such, the market value of every Class member's vehicle is identified in the valuation reports. *Id.* at 8–10. Simply remove the PSA deductions, and the detailed valuation report identifies the ACV.

### 4. To Calculate the PSA, Progressive Ignores and Deletes Market Data That Disproves Its Market Theory

Notwithstanding these markets and standards, Progressive imposes a PSA deduction that averages ██ %. Lacey Report, at 13. This is in line with the ██ ███████████████████████████████████████████████ , and is achieved by manipulating (and then misrepresenting) the data.

Here's how it works: Mitchell hired Blaine Bogus and a three-person team (the "Bogus Team") at J.D. Power to calculate the PSA. ECF No. 93-7 ("Bogus Dep.") at 18-19. Mitchell provides list price data gathered from Internet advertisements. *Id.* at 22. The Bogus Team compares that data to sales data from its

"Power Information Network" ("PIN") of dealers. *Id.* at 22-23. The Bogus Team's data is a black box: Neither Progressive, Mitchell, nor the Bogus Team conducted any analysis to determine whether the PIN dealers are representative of the used vehicle market and, instead, simply " ███████████████████████████ ███████ ." *Id.* at 156-157. J.D. Power refused to disclose any dealership from which it obtains sales data and designated it as "Highly Confidential—Outside Counsel's Eyes Only." Nevertheless, Progressive accepts the PSA without question as a basis for reducing its insureds' ACV payments.

The most egregious part of the scheme is, in calculating the PSA, the Bogus Team, incredibly, excluded from the data all transactions where the sales price exceeded the list price and, until July 2021, excluded every transaction where the vehicle sold for list price. *Id.* at 58-61; Lacey Report at 3-6. This bears repeating: The Bogus Team made the spurious assumption that transactions at or above market price are outliers, notwithstanding that it made no inquiry to determine how often those purported "outliers" occur and, in fact, had no idea how many records were being excluded. Bogus Dep. at 58-59, 62-64. An honest look at the data shows vehicles selling at list/market price—not even counting transactions where a vehicle sold for more than market price—comprise ████% of the PIN transactions. Lacey Report at 4. Discarding and deleting data because of an undesirable (to Progressive) but relevant characteristic invalidates the data. *Id.* Correcting for the deliberate

exclusion of transactions at list price results in a ███████ variance between sold and list prices. *Id.* & Exhibit 8 thereto at 66.

And this does not even account for transactions where the sold price exceeded the list price by a penny or more, which the Bogus Team also discarded, keeping no record of how many of such transactions were excluded. Bogus Dep., at 62-64; Lacey Report, at 4-5. As Felix explains, for a vehicle to sell for higher than its listed price is not an outlier or an oddity. Felix Report, at 9-12. Martin identified that 23.47-29.93% of vehicles were reported to the DMV as sold for more than listed price. ECF No. 96-11 ("Martin Report") at 25, 27, 30, 32, 34, 37, 39, 41, 44, 46, 48, 51.

Moreover, the Bogus Team does not account for—and has never even investigated—transactions involving a military/employee/family discount, financing through the dealership, or other reasons a sold price might be less than list price that are unrelated to a vehicle's market value. Bogus Dep., 74-76. Instead, after tossing transactions selling at list price or a penny more, the Bogus Team credulously accepts that any difference up to a staggering ███ between list and sold price is the product of negotiation in a cash transaction,[2] despite never making any effort to determine whether that is true. *Id.* at 75-76. Consider that one of the primary reasons a vehicle might sell for less than list price is that a dealership simply offered less

---

[2] Like Felix, Plaintiff is using "cash transaction" to encompass those where the consumer self-financed entirely as well as transactions where the consumer secured outside financing rather than using the dealership to secure financing.

than it otherwise would have on a vehicle trade-in—or might be incentivized to sell for a below market price because the purchaser has an attractive trade-in. Felix Report, at 7-8. Not only are these instances unrelated to actual market value, they are irrelevant in the context of total-loss insureds, who have no vehicle to trade in. Also, instances where a dealership might chop a few hundred dollars off list price because the consumer is financing through the dealership—meaning it will more than make up the profit difference—are irrelevant because Progressive owes actual cash value, not actual financed value. And that some people may be entitled to a discount is irrelevant to the actual market value.

Unfortunately, in response to Plaintiff's subpoenas, Progressive and its vendor companies claim they no longer have the full transactional data and thus cannot calculate the actual difference (if any) between sold and list prices when considering all transactions. So, Plaintiff retained a statistician, Jeffrey Martin, to analyze a large set of transparent data reported by all dealers to state DMV offices. He identified a robust sample size of 1.4 million-2.4 million matches per year. Martin Report, at ¶¶ 25, 32, 39, 46. The results confirm Felix's testimony: The median S/L Ratio for each year is 1 (meaning sold and list/market price are equal), regardless of whether all transactions are considered or if outlier ranges are applied. *Id.* at ¶¶ 25, 27, 30, 32, 34, 37, 39, 41, 43, 46, 48, 51. The mean S/L ratio is 1.0 or a *de minimis* amount less or more than 1.0. *Id.* at ¶¶ 34, 37, 41, 43, 48, 51, 54, 57. This confirms that list price

equates to market value and, thus, the PSA deduction is invalid. These results are summarized in the figures and tables in ECF No. 96-11, at 52-65.

In short, Progressive began with a foregone conclusion: "Consumers negotiate down the advertised price of vehicles in cash transactions." They manufactured "support" for this assumption and thumbed the scale by ignoring and deleting all data to the contrary. Once this lone invalid adjustment is removed, each Mitchell Report documents a good faith appraisal of each Class Member's vehicle.

## B.    Course of Proceedings

On January 26, 2024, the district court entered its Order granting Plaintiff's motion for class certification. ECF No. 131 (the "Order"). The Order evinces the district court's thorough review of the claims, defenses, and evidence. *Id.* at 3–8. After recounting the parties' positions and evidence, the court methodically analyzed the application of each Rule 23 element, construing these rules as they have been applied by this Court. It carefully and correctly applied the Rule 23 elements to the facts of this case, finding that Plaintiff's claims are suitable for class treatment under Rule 23(b)(3), in line with the ten (of thirteen) courts who reached the same conclusion as to materially identical claims and records.

## SUMMARY OF ARGUMENT

A district court abuses its discretion only if its decision is one with which "no reasonable person" could agree. *United States v. Thomas*, 453 F.3d 838, 845 (7th

11

Cir. 2006). Did the district court abuse its discretion by certifying a breach of
contract class in a case materially indistinguishable from ones that have been
certified by **ten courts** (out of thirteen)? *See Freeman v. Progressive Direct Ins. Co.*,
No. 1:21-cv-03798-DCC, 2024 U.S. Dist. LEXIS 83402 (D.S.C. May 8, 2024);
*Reynolds v. Progressive Direct Ins. Co.*, No. 5:22-cv-503-LCB, 2024 U.S. Dist.
LEXIS 63031 (N.D. Ala. Apr. 3, 2024); *Curran v. Progressive Direct Ins. Co.*, 345
F.R.D. 498 (D. Colo. 2023); *Costello v. Mountain Laurel Assurance Co.*, No. 2:22-
CV-35, 2024 U.S. Dist. LEXIS 11283 (E.D. Tenn. Jan. 22, 2024) (report &
recommendation); *Drummond v. Progressive Specialty Ins. Co.*, No. 21-4479, 2023
U.S. Dist. LEXIS 140205 (E.D. Pa. Aug. 11, 2023); *Brown, et al.  v. Progressive
Mountain Ins. Co., et al.*, No. 3:21-cv-175-TCB, 2023 U.S. Dist. LEXIS 136472
(N.D. Ga. Aug. 3, 2023); *Volino v. Progressive Cas. Ins. Co.*, No. 21 Civ. 6243,
2023 U.S. Dist. LEXIS 44666 (S.D.N.Y. Mar. 16, 2023); *see also Chadwick v. State
Farm Mut. Ins. Co.*, No. 4:21-cv-1161-DPM, 2024 U.S. Dist. LEXIS 47154 (E.D.
Ark., filed Mar. 18., 2024) (certifying class challenging State Farm's version of the
PSA); *Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 2:20-cv-02482, 2023 U.S.
Dist. LEXIS 153813 (W.D. Tenn. Aug. 25, 2023) (same).[3] The question answers
itself: The answer is emphatically no.

---

[3] The Second, Tenth, and Eleventh Courts of Appeals denied Rule 23(f) petitions for
interlocutory appeal in *Volino*, *Curran*, *Brown*, and *Reynolds*, respectively. Also, the
Ninth Circuit granted the plaintiff's Rule 23(f) petition for interlocutory review of

Plaintiff and Class members sustained total losses to vehicles insured by Progressive. To determine the ACV of the totaled vehicles, Progressive followed a uniform process, which involved documenting the particulars of the totaled vehicle and inputting that information into the Mitchell International, Inc., WorkCenter Total Loss ("WCTL") system. The WCTL utilizes the comparable ("comp") methodology—the industry-standard appraisal process for determining the market value of standard vehicles (*i.e.*, non-rare or antique vehicles)—which entails taking the average price of vehicles for sale comparable to the insured vehicle (year, make, and model), adjusted for verified differences between the insured and comp vehicles in mileage, equipment, and condition. Everyone—Plaintiff and her experts and Progressive and its experts—agrees such adjustments are appropriate.

The sole dispute concerns the "projected sold adjustment" (PSA), a reduction to the list/market prices of comp vehicles that purports to "reflect consumer purchasing behavior (negotiating a different price than the listed price)." Unlike the other adjustments, PSAs are (i) speculative (at best) and (ii) *always* negative. Worse, they are calculated using rigged data. For years, Progressive and its vendor companies claimed the PSAs are justified by millions of transactions where the list price of a vehicle was matched to its reported sale price. Incredibly, to manufacture

the class certification denial in *Ambrosio*, one of only three denials of similar claims, and the only denial for which review was sought. *See Ambrosio v. Progressive Preferred Ins. Co.*, No. 24-1633, ECF No. 29 (9th Cir. Apr. 26, 2024).

meretricious "support" for the PSAs, they simply purged from the database all transactions where a vehicle sold for list price or more. Using *only* its skewed data, and making spurious assumptions about this remaining data, Progressive calculates and applies PSAs to reduce its insureds' ACV payments by, on average, █████.

Plaintiff brought this breach of contract action individually and on behalf of a class of similarly situated total loss claimants whose ACV payments were reduced by the invalid PSAs. Each element of the breach of contract claims will be decided based on common evidence. And the evidence, to put it bluntly, shows that the PSA is bunk. Indeed, millions upon millions of state DMV transactional data show vehicles typically sell for list price, as shown in the following exemplary graph, found at ECF No. 93-1 at 3.



**Figure 2 DMV Data – Ratio of Sold Amount to List Price**

That is why Progressive and its vendor companies were forced to take the indefensible step of simply deleting and manipulating data to manufacture a fake market to "support" the meretricious PSA—without such manipulation, the typical sold-to-list ratio hovers at approximately 1.0. This is not surprising: As explained above, Plaintiff's industry expert, Kirk Felix, explained the premise underlying the PSA—that dealers list vehicles above market with the expectation of future negotiation—is outdated and false. In the data-rich, competitive modern auto market, dealers price vehicles to market and do not engage in systematic negotiation-

driven price discounting. Of course, as with any other product, some vehicles sell for below market prices—perhaps because of specialized, atypical discounts, perhaps because of extraneous factors allowing dealers to shift profits to ancillary products or because of dealer-financed purchases, perhaps because some consumers are simply excellent negotiators who can secure atypical, below-market deals—but this does not change the fact that used autos in the modern market are priced to market. See ECF No. 93-5 at 3-6, ECF No. 95-6 at 1-12, ECF No. 96-11 at 2-16; *see also Signor*, 72 F.4th at 1231. This reality, demonstrated by industry experts and supported by the data, provides color for Progressive's decision to cook the books to spawn a basis for the PSA.

Moreover, Plaintiff presented evidence through her appraisal expert, Jason Merritt, that other than the PSA, the individualized Mitchell Valuation Reports document a sound, reliable calculation of ACV. So, at trial, the predominant question will be whether Progressive's application of the PSA means it was not considering "market value" but was instead paying an artificially deflated value. *See Smith v. S. Farm Bureau Cas. Ins. Co.*, 18 F. 4th 976, 980–81 (8th Cir. 2021). If so, the clear remedy—supported by expert appraisers and approved in the numerous cases discussed above—is awarding damages calculated by backing out the invalid PSA from the WCTL reports. Progressive thumbed the scales by applying the PSAs, and

the remedy is to remove the thumb from the scales—to excise the only flaw in its ACV valuation.

In this appeal, Progressive claims the district court "abused its discretion"—meaning its decision was one with which no reasonable person could agree—when it sided with the overwhelming consensus of courts that have certified materially identical claims. There was no abuse of discretion here. Simply put, there's a reason so many courts have certified classes challenging the PSA: The requirements of Rule 23(b)(3) are convincingly met. Certainly, it was no abuse of discretion for the court to join with the overwhelming consensus in finding class treatment is appropriate. Indeed, here and before the district court, Progressive scarcely even defends the propriety or legitimacy of the PSA, focusing its defense instead on the speculation it could have paid Plaintiff and Class members *even less* had it chosen some other company as the vendor to calculate ACV. In other words, Progressive's strategy is to change the subject. But this case is about what Progressive did, not about any of the many things it did not do. And in any event, Plaintiff's claim is not that the company Progressive chose as a vendor to calculate ACV constituted a breach of contract—Plaintiff's claim is that that vendor's *calculation of ACV* constituted a breach of contract. So, it is not responsive for Progressive to suggest it could have picked a different company to use in its determination of ACV. The issue is not the company; the issue is the determination of ACV.

17

Progressive also argues it may have *over*valued other elements of the ACV calculation. But class treatment is determined based on evidence, not speculation. Just as allegations from a plaintiff are insufficient to secure class certification, so too are allegations or speculation from a defendant insufficient to *preclude* class certification. Setting aside pure speculation, the actual evidence is in accord: But for the PSAs, Mitchell's valuations are solid, sound, and reliable calculations of ACV determined by market value, age, and condition, as Progressive's Policy requires.

Ten courts—the overwhelming majority—concluded that claims and records materially indistinguishable from those below are suitable for class treatment. It is not the case that "no reasonable person" could agree with such conclusions. So, it was no abuse of discretion to find class treatment is appropriate. As more fully set forth below, this Court should affirm the Order on appeal.

## STANDARD OF REVIEW

Class certification is appropriate where a plaintiff shows by a preponderance of evidence that the elements of Rule 23 are met. *E.g.*, *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). If a named plaintiff satisfies such requirement, there is no discretion—class certification must be granted. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (Rule 23 "creates a categorical rule entitling a plaintiff" who satisfies the Rule's elements "to pursue his claim as a class action.").

Otherwise, the decision to certify a class is subject to review only for abuse of discretion. *E.g.*, *Kress v. CCA of Tenn., LLC*, 694 F.3d 890, 892 (7th Cir. 2012). An abuse of discretion occurs if the decision is "clearly unreasonable." *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 10 (7th Cir. 1980). In turn, a decision is clearly unreasonable where "no reasonable person would agree with the decision made by the trial court." *Smith v. Hunt*, 707 F.3d 803, 807-08 (7th Cir. 2013) (quoting *Thomas*, 453 F.3d at 845).

**ARGUMENT**

## I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING COMMON ISSUES PREDOMINATE

As articulated above, the Order is subject to review for abuse of discretion. Two points are critical at the outset. First, Progressive's argument is the district court abused its discretion by failing to engage in a rigorous analysis. IB at 27-28. Even if so, the remedy would be to remand for the district court to engage in such analysis in the first instance, given this Court is a "court of review, not of first view." *United States v. Dingwall*, 6 F.4th 744, 762 (7th Cir. 2021) (quotation omitted); *see generally Eddlemon v. Bradley Univ.*, 65 F.4th 335, 341 (7th Cir. 2023) (finding district court failed to engage in a "rigorous analysis" and remanding to apply such analysis rather than reversing outright).

Second, reversal is appropriate only if the decision is "clearly unreasonable," *Curtiss-Wright*, 446 U.S. at 10, meaning "no reasonable person would agree with

19

the decision made by the trial court." *Smith v. Hunt*, 707 F.3d 803, 807-08 (7th Cir. 2013) (quoting *Thomas*, 453 F.3d at 845). As this Court unforgettably explained, those who contest findings under an abuse of discretion standard are like "rich men who wish to enter the Kingdom; their prospects compare with those of camels who wish to pass through the eye of a needle." *United States v. Glecier*, 923 F.2d 496, 503 (7th Cir. 1991), *cert. denied*, 502 U.S. 810 (1991) (citing Matthew 19:24). The district court joined with nine other jurists in finding class treatment is appropriate. Respectfully, not all ten jurists are so unreasonable, such that no reasonable person would agree with them. Agreeing with nine reasonable, cogent opinions is not an abuse of discretion: Progressive failed to pass through the eye of a needle.

**a. The district court did not abuse its discretion in finding that it is more likely than not that common evidence can be used to establish whether class members have Article III standing and that Progressive breached its contract.**

Progressive's first argument is the district court abused its discretion in finding common issues were more likely than not to predominate over individual ones as to the issues of liability (i.e., whether Progressive is liable for breach of contract) and Article III standing.[4] IB at 28-35. In so doing, Progressive conflates

---

[4] As previously explained, whether class treatment is appropriate is analyzed under an abuse of discretion standard. The underlying decision on class treatment is analyzed under a preponderance of the evidence standard. Taken together, the question is whether the district court abused its discretion in finding a plaintiff showed it was more likely than not the Rule 23 elements were meant. *See generally*

the two issues. For clarity, Plaintiffs address these distinct issues (Article III and liability) distinctly.

### b. Article III

As this Court explained, Article III and liability are separate questions that must be separately analyzed. *E.g.*, *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008) ("It is best to confine the term 'standing' to the Article III inquiry and thus to keep it separate from the plaintiff's entitlement to relief or her ability to satisfy the [class certification] criteria."); *accord Ariz. St. Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) (cautioning against conflating the merits with Article III standing). The merits analysis is whether a plaintiff is correct—the Article III analysis is whether a plaintiff is permitted to *attempt to prove* she is correct.

Progressive argues that if it paid ACV, Plaintiff would therefore lack standing. IB at 31-32.[5] That's wrong, but in any event, Plaintiff alleges and presents evidence it did not pay ACV. If Plaintiff is wrong—if a jury or court finds Progressive *did* pay ACV—her claims will fail on the merits. But, if so, that would be an adjudication

---

*Gildon v. Astrue*, 260 F. App'x 927, 929 (7th Cir. 2008) ("preponderance of the evidence" standard is a "more likely than not" standard).

[5] With all due respect, this betrays a fundamental misunderstanding of Article III standing. A court can only adjudicate whether Progressive paid a vehicle's ACV if it has jurisdiction to adjudicate whether Progressive paid the vehicle's ACV. Progressive is essentially asking this Court to decide Progressive did not breach its contract, and *for that reason* find it lacks jurisdiction to decide whether Progressive breached its contract.

that Plaintiff is wrong, not that her claims cannot be adjudicated. *See Gates v. Towery*, 430 F.3d 429, 432 (7th Cir. 2005) ("By Chicago's lights, unsuccessful lawsuits should be dismissed [for lack of standing] rather than decided on the merits. *That's not the way things work*: A bad theory (whether of liability or of damages) does not undermine federal jurisdiction") (emphasis added). If Plaintiff's claim is correct, she suffered a monetary injury of $635.15 (A-108-109, ECF No. 93-5 at 12-14) which is a concrete, Article III injury. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("[C]ertain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as . . . monetary harms.").[6]

### c. Liability

As for liability, Progressive claims Plaintiff acknowledged the "question on which this case turns" is whether it "violated its contractual obligation to pay … class members the ACV of their vehicles." IB at 34. The ellipses is doing a lot of work. What Plaintiff explained is that Progressive is obligated to pay ACV and to

---

[6] Frankly, the question is absurd. Article III standing, according to the Supreme Court, is built upon the "single basic idea" of separation of powers. *TransUnion*, 141 S. Ct. at 2203. So far, so good. Yet, Progressive claims Article III prevents one private party from suing another to vindicate private rights even where no separation-of-powers principles are at play. This cannot be true: If separation of powers is the "single basic idea" upon which Article III doctrine is built, it cannot foreclose claims that a contract between private parties was breached.

determine ACV based on market value, age, and condition. ECF No. 93 at 5; ECF No. 120 at 4. By applying the PSAs, Progressive breached both obligations—it underpaid ACV, and it did not determine ACV based on market value, but rather on a truncated, manipulated, artificially low "market" of its own invention. *Smith v. S. Farm Bureau Cas. Ins. Co.*, 18 F.4th 976, 980-81 (8th Cir. 2021) (if the PSA is "contrary to industry practices and consumer experiences and therefore not reflective of the vehicle's fair market value, then the insurance company did not consider the [vehicle's] fair market value; it considered an artificially lower value, in breach of its contractual duty") (cleaned up); *Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *5 ("Progressive promised to determine ACV by the market value, age, and condition of the vehicle at the time the loss occurs. But if Plaintiff is right, Progressive determines ACV not by market value, but by an artificial, downwardly skewed, and deflated 'market' of its own invention") (cleaned up).[7]

---

[7] Suppose random absent Class Member No. 745 brings an individual case. To support her claim, she presented (i) the Mitchell Report, (ii) Felix's testimony that dealers price vehicles to market, and sales below market value do not undermine the theory, (iii) Merritt's testimony that proper appraisal of ACV does not include "negotiation" adjustments such as the PSA, but that the Mitchell Report otherwise constitutes a sound, valid appraisal of ACV (iv) Lacey's testimony that the PSA is premised on truncated, manipulated, invalid data, and (v) Martin's testimony that, on average, vehicles sell for list price. Would that claim set forth a prima facie case? Of course! Indeed, every court to analyze the evidence has concluded summary judgment is inappropriate and a jury should resolve the claim. *Brown v. Progressive Mountain Ins. Co.*, 2024 WL 399479, at *3 (N.D. Ga. Feb. 1, 2024); *Volino v. Progressive Cas. Ins. Co.*, 2024 U.S. Dist. LEXIS 52783 (S.D. N.Y. Mar. 22, 2024); *Chadwick v. State Farm Mut. Auto. Ins. Co.*, No. 4:21-cv-1161-DPM, 2024 U.S.

Bluntly, the district court did not abuse its discretion in finding that liability—i.e., whether Progressive breached the contract—is subject to resolution based on common evidence. The core dispute is whether list prices equate to market value. Progressive says the answer is no, while Plaintiff says it is yes. Both parties believe the answer is applicable to every class member (indeed, that's why Progressive applied the PSA as to every class member). To support her claim, Plaintiff presents (i) expert testimony from Felix that in the modern used car industry, car dealerships price vehicles to market; (ii) empirical data from Progressive; (iii) analysis thereof from Lacey, explaining that Progressive excluded most of the data and misinterpreted what remained; (iv) state DMV data; and (v) analysis thereof from Martin, showing vehicles typically sell for list price, which supports Felix's and Merritt's opinions. If an absent class member were to bring an individual claim—like the named plaintiffs in numerous jurisdictions bringing indistinguishable claims based on the same evidence—they could rely on such evidence to make a prima facie case. At the very least, it was not an abuse of discretion for the district court, upon presentation of the evidence, to conclude it is more likely than not that the answer will be driven more by common evidence than by individualized evidence.

> **d. The district court did not abuse its discretion in finding that individualized vehicle valuations—which have already occurred and are not contested—do not predominate over common questions.**

---

Dist. LEXIS 47154 (E.D. Ark. Mar. 18, 2024). So, absent class members could rely on Plaintiff's evidence to make a prima facie case.

Progressive's next argument is vehicle valuations are inherently individualized, and it was therefore an abuse of discretion for the district court to find common issues will likely predominate. IB at 35-47. Not so. To be sure, vehicle valuations are individualized. But *Mitchell has done them*, and no one questions their validity. Indeed, setting aside the PSA, *every witness*, including Plaintiff's, agrees with Mitchell's methodology and its application thereof. ECF No 93-2 at 59-63, 83, 85 (Retton Dep), ECF No. 120-1 at 7-8 (Walker Dep), ECF No. 119-1(Kinney Dep). True, if Plaintiff were contesting the Mitchell Reports in their entirety and alleging things must begin anew, class treatment may be inappropriate. But unlike in other cases on which Progressive relies, Plaintiff is not doing so. As such, the individual nature of vehicle valuations does not preclude class treatment—certainly, it was not an abuse of discretion for the district court, along with nine others, to so find.

The cases on which Progressive relies do it no favors. In *Howland v. First Am. Title Ins. Co.*, 672 F.3d 525 (7th Cir. 2012), this Court held, in the RESPA context, the lower court did not abuse its discretion in determining that whether an attorney acting as a title agent performed title services (meaning any compensation was for work performed) or whether she did not (meaning the compensation was an illegal kickback) was too individualized to merit class treatment. That does nothing to aid the analysis here. In *Huber v. Simon's Agency, Inc.*, 84 F.4th 132 (3d. Cir. 2023), the Third Circuit agreed that questions of standing bear on the predominance analysis.

Perhaps so, but as demonstrated *supra*, Article III is not relevant here—and certainly does not defeat predominance.

Next, Progressive cites *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883 (7th Cir. 2014). IB at 36-38. There, the trial court granted class certification under Rule 23(b)(2) of a claim for injunctive relief, but denied it under Rule 23(b)(3) of the claim for damages. *Id*. at 885-86. While State Farm appealed, the insured did not, meaning the only question facing this Court was whether the claim for injunctive relief and certification under Rule 23(b)(2) were proper. *Id*. The policy at issue was silent on how State Farm must assess hail damage and determine the amount payable for repair costs, and it allegedly did so using an ad hoc process by sending multiple adjusters to the same property, all of whom performed different assessments. *Id*. at 887-88. So, the plaintiff sought injunctive relief under the theory that State Farm possessed not only a duty to compensate insureds for repair costs, but also some extracontractual duty "to examine all hail-damaged roofs pursuant to a uniform and objective standard." *Id*. at 889. In other words, it wanted a court to order State Farm to adopt a uniform process and then employ that process to reassess the hail damage and repair costs—to start again from scratch.[8]

---

[8] Progressive asserts this Court "squarely held that claims that turn on the actual cash value of insured property are not suitable for class treatment." IB at 36. That's simply wrong: This Court did nothing more than affirm class treatment under Rule 23(b)(2) was inappropriate based on the specific facts and theories before it in *Kartman*. Also, the "[ACV] of insured property" was not even at issue in *Kartman*! Indeed, this

That is nothing like this case. For one thing, the plaintiff in *Kartman* explicitly wanted to toss out the insurer's damage valuations and start anew, which is indeed an inherently individualized process. Here, Progressive already performed the individual vehicle valuations employing its standard methodology, and far from contesting those valuations and seeking new ones, Plaintiff *agrees with them*, other than the PSAs. In other words, Plaintiff is not seeking to force Progressive to try again, start anew, and re-assess the vehicles from scratch. Rather, Plaintiff is herself presenting evidence of the ACV of each class members' vehicles, using Progressive's own vehicle valuations. And "Progressive can hardly complain that the methodology [Plaintiffs] would impose on them is the one Progressive chose and developed." *Volino*, 2023 U.S. Dist. LEXIS 44666, at *9. So, the question is whether absent class members could rely on the evidence Plaintiff has presented to make a prima facie case were they to bring their own action—and the answer is yes.

Plaintiff does not allege Progressive possesses some extracontractual duty, nor is she seeking injunctive relief. Instead, Progressive's duties are textually established by the Policy—it promised to pay ACV as "determined by market value, age, and condition of the vehicle at the time of loss." Plaintiff's claim isn't that Progressive must use a particular vendor or formula— i.e., Mitchell (without the

---

Court did not mention "actual cash value" a *single* time. Apparently, by "squarely addressed," Progressive meant "did not address at all."

PSA)—as a matter of *law*, but rather that Mitchell without the PSA constitutes ACV, consistent with the Policy, as a matter of *fact*. *See Curran*, 2023 U.S. Dist. LEXIS 224952, at \*6. Indeed, courts addressing materially indistinguishable claims and evidence agree that after the PSA is excised, a Mitchell valuation constitutes admissible evidence of value that a jury could reasonably credit. *See, e.g.*, *Volino*, 2023 U.S. Dist. LEXIS 44666, at \*\*8-9; *Curran*, 2023 U.S. Dist. LEXIS 224952, at \*7 (common issues were likely to predominate because the plaintiff was using common evidence to attempt "to persuade the factfinder that ACV is generally equal to the Mitchell evaluation less any PSA deduction"); *Brown*, 2023 U.S. Dist. LEXIS 136472, at \*\*6-8 (similar). As one court put it, the individualized nature of vehicle valuations does not preclude class treatment because the plaintiffs' evidence demonstrated "Progressive could determine the ACV for any given class member, then, by consulting information on hand already: the Mitchell Report." *Reynolds*, 2024 U.S. Dist. LEXIS 63031, at \*11. Again, if Plaintiff's claims were that the Mitchell Report must be tossed and ACV recalculated from the ground up, class treatment would likely be inappropriate—but that is not her claim. And in any event, Progressive *is* required to calculate ACV based on a "prescribed formula"—the "market value, age, and condition" of the totaled vehicle at the time of loss. *See Clippinger*, 2023 U.S. Dist. LEXIS 153813, at \*n.8; *accord Reynolds*, 2024 U.S. Dist. LEXIS 63031, at \*15 ("Progressive's Policy specifies the method for

calculating ACV: 'the market value, age, and condition of the vehicle at the time the loss occurs.'").

It was not an abuse of discretion for the district court to agree with nine others that this evidence—along with expert testimony and empirical data—could be used by class members to make a prima facie case were they to bring an individual action. *See Tyson Foods*, 577 U.S. at 455; *Curran*, 2023 U.S. Dist. LEXIS 224952, at *5 ("Proposed class members could use the same evidence…in their own individual actions to refute the accuracy of the PSA deduction.").

Progressive fares no better relying on cases bringing different theories of liability and different evidence—or rather, lack thereof. IB at 38-42. For example, it relies on *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134 (9th Cir. 2022) and *Ngethpharat v. State Farm Mut. Auto. Ins. Co.*, No. C20 454 MJP, 2022 WL 1404526 (W.D. Wash. May 4, 2022), which involved allegations that insurance companies breached their policies by violating the same state regulation. In *Lara*, the plaintiffs challenged the way condition adjustments were disclosed, alleging they were "not itemize[ed] or explain[ed]," as required by the state regulation. 25 F. 4th at 1137. But they offered no evidence that violating the disclosure requirements constituted a breach, resulted in an unsound ACV, or caused damages. The same was true in *Ngethpharat*. 2022 WL 1404526, at *3 (noting plaintiffs never "*intended* to show that they received less than the ACV"). The comparisons fall flat: A

29

regulatory violation is not *ipso facto* a breach. Consider a negative condition adjustment of $1,000.00 that was accurate (because the vehicle was in poor condition) but not itemized. To establish a valid claim, the insured would have to show not only that the adjustment was not itemized (regulatory violation), but *also* was inaccurate (breach). But because the plaintiffs' cases hinged on a technical regulatory violation, they put on no proof they received less than ACV, nor even attempted to present common evidence—or any evidence at all—of how to appraise a vehicle's cash market value. *See also* ECF No. 120 at 14-16.

By contrast, Plaintiff presents factual evidence that establishes liability and damages, not a regulatory violation. Even had Progressive itemized every detail of how it calculated the PSA deductions, Plaintiff's claims would be precisely the same because the PSA is inaccurate, not merely insufficiently disclosed. As one court put it, "[i]f the PSA is invalid based on the evidence of the used car market, then it is not a proper element of calculating ACV." *Brown*, 2024 WL 399479, at *3. And Plaintiff put forward common evidence that the remainder of the WCTL valuation constitutes a proper appraisal of ACV determined by market value, which, if credited by a jury, would establish the damages amount. This is precisely the distinction made by numerous courts in distinguishing *Lara*. It is not that they disagreed with *Lara*— instead, they simply found it inapposite because, unlike in *Lara*, the plaintiffs challenging PSA deductions *do* allege Progressive paid less than ACV and *did*

present common evidence of how to calculate ACV in a manner consistent with the Policy, which constitutes common evidence of underpayment,[9] not merely insufficient itemization, and of a breach of the Policy, not an extracontractual state regulation. *E.g.*, *Volino*, 2023 U.S. Dist. LEXIS 44666, at **8-9 (distinguishing *Lara* because "the plaintiffs offered no proof of [ACV], and did not even argue that they had been underpaid. Rather, those plaintiffs argued that certain adjustments violated technical state insurance regulations that did not affect the valuation."); *Drummond*, 2023 U.S. Dist. LEXIS 140205, at **10-11; *Clippinger*, 2023 U.S. Dist. LEXIS 153813, at **10-11; *Curran*, 2023 U.S. Dist. LEXIS 224952, at *6; *Costello*, 2024 U.S. Dist. LEXIS 11283, at *7; *Freeman*, 2024 U.S. Dist. LEXIS 83402, *n. 10 (distinguishing *Lara* and *Ngethpherat* because "they never intended to prove that they received less than ACV…Such is not the case here."). Frankly, it beggars belief that all these courts were abusing their discretion by finding *Lara* is distinguishable.

Progressive also misplaces its reliance on *Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414 (5th Cir. 2023). There, the plaintiffs alleged USAA breached its

---

[9] This is why it's irrelevant that, as Progressive points out, IB at 38, *Lara* noted that unless the plaintiffs showed underpayment of ACV, they "cannot win on the merits." 25 F. 4th at 1139. That's true—and the problem was the plaintiffs *did not believe they had to prove underpayment and thus presented no evidence as to that issue*. Instead, they thought requiring evidence of underpayment would "force[] them to 'prove two breaches'—the violation of the regulation and then a second breach of actual underpayment." *Id*. But, while it may be the case that the plaintiffs could prove a regulatory violation without proving underpayment, they could not prove a *breach of contract* without proving underpayment.

contract by valuing cars using a company that was illegal under a Louisiana regulation because it was not a "recognized used auto industry source." *Id*. at 417. Their theory was that USAA was required to use one of those recognized companies, such as NADA, KBB, Edmunds, etc. If so, plaintiffs' theory was that damages could be measured by using NADA values. *Id*. at 419. But plaintiffs acknowledged this was arbitrary, as NADA was but one of several permitted "recognized used auto industry source[s]" permitted by Louisiana law. So, even if the plaintiff's theory were correct, that would mean any "recognized used auto industry source," not just NADA, could be used *as a matter of law* to establish damages or the lack thereof. *Id*. That is not Plaintiff's theory. ECF No. 120 at 10 & n.3.

Instead, her theory is not that damages are established as a legal matter (as in *Sampson*), but as a factual matter. In *Sampson*, the plaintiffs conceded other guidebooks, not just NADA, also constituted ACV as a matter of law *under their own theory*—they just posited they were entitled to pick whichever of those options they wanted, which the Fifth Circuit rejected. Critically, the plaintiffs put forward no evidence NADA valuations constituted ACV *in fact*, nor could they: As the Fifth Circuit explained, NADA cannot constitute ACV in fact because, among other glaring shortcomings, its values, unlike Mitchell's, "do not account for a vehicle's unique condition . . . which is relevant to its [ACV]." *Id*.  Indeed, the *Sampson*

plaintiffs explicitly disclaimed any "require[ment] to demonstrate [] NADA equals cash value in fact[.]" *Id*. at 419. As one court pointed out:

> [The *Sampson* plaintiffs] had not demonstrated that NADA equates to ACV in fact, nor put forward a coherent theory on which NADA, but not KBB or Edmunds, etc., can serve as a determinant of injury and liability as a matter of law. Here, in contrast, the Court finds that common issues predominate precisely because of the coherent theory Plaintiff sets out—that Mitchell, but for the PSA deduction, results in ACV, so any estimate with the PSA deduction falls short in that amount.

*Curran*, 2023 U.S. Dist. LEXIS 224952, at *6 (cleaned up); *see also Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *8 (distinguishing *Sampson*). In other words, Plaintiff agrees that vehicles must be individually valued. That's exactly what the Mitchell valuations are—individual market valuations. Progressive provides no reason why its own market valuations cannot be used as evidence of ACV. *Cf. Volino*, 2023 U.S. Dist. LEXIS 44666, at *9 ("Progressive can hardly complain that the methodology Plaintiffs would impose on them is the one Progressive chose and developed.").

Put bluntly, Progressive is doing nothing more than attempting to change the subject by abandoning any defense of what it actually did, and instead suggesting perhaps it would not have been explicitly against the law to use a company other than Mitchell to calculate the ACV of its insureds' totaled vehicles. IB at 41. Plaintiff does not argue otherwise—indeed, Plaintiff does not argue it was against the law to select Mitchell as the company through whom to calculate ACV. But whatever

company Progressive selected, it was required to comply with its contract—and Plaintiff has presented evidence that Progressive failed to do so by underpaying ACV and by failing to determine ACV based on market value, age, and condition. That Progressive could have breached its contract while using a different company to do so is irrelevant. Said another way, Plaintiff's claim is not that Mitchell is a legally impermissible company for calculating ACV. Plaintiff's claim is that the calculation of ACV was not "determined by" market value and, concomitantly, was too low by the amount of the PSAs. If so, it would be no defense for Progressive to point to guidebook values that *are also* less than ACV. *See Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *6 ("Yes, Progressive could have harmed members more had it used some other method of determining ACV. But the possibility of greater harm under the NADA standard does not imply a reciprocal benefit from using the PSA; relative privation is still privation.") (*citing Drummond*, 2023 U.S. Dist. LEXIS 140205, at *9 (similar)); *see also* ECF No. 120 at 8-9, 14-15.

Moreover, Progressive points to no *evidence* of a "source" that would be consistent with its Policy requirement to "determine" ACV based on market value, age, and condition. Certainly, guidebook values do not do so, as they are not "determined by" market value, are not specific valuations of a vehicle's ACV, both of which are required by Progressive's Policy. ECF No. 120 at 9-10, 15-16. It does

Progressive no good to point to something that would *also* breach its contract had it been used.

Oddly, Progressive pivots to real estate cases that support *Plaintiff's* position. There, the plaintiffs offered common evidence of how to calculate ACV—the Xactimate method utilized by State Farm, but without the offending element (labor depreciation). *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460–61 (6th Cir. 2020); *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 375–76 (8th Cir. 2019); *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 711 (5th Cir. 2020). State Farm's contract required it "to calculate the ACV payment in accordance with the prescribed formula"—"the amount it would cost to repair or replace damaged property, less depreciation." *Stuart*, 910 F.3d at 376. Progressive wrongly claims there was a "prescribed formula" for determining ACV in those cases, but not here.[10] In so arguing, Progressive ignores its explicit contract duty to pay ACV determined by "market value, age, and condition," which, though framed differently, is just as

---

[10] In *Mitchell*, *Hicks*, and *Stuart*, the insurance policies explicitly, or by incorporation of state law, required the insurer base ACV payments on "replacement cost less depreciation," and the plaintiffs alleged depreciating labor violated such duty. Notably, the "replacement cost less depreciation" requirement was not self-executing and State Farm used an estimation vendor (Xactimate) to meet its ACV obligations. Here, Progressive's Policy provides an ACV definition that is, if anything, *more specific* than "replacement cost less depreciation" and Plaintiff has common proof that, by applying PSA deductions based on manipulated data, verifiably false assumptions about the used-car market, and which are contrary to appraisal standards, Progressive failed to pay ACV based on "market value, age, and condition" of the loss vehicles.

(or more) specific than the prescribed formulae from *Mitchell*, *Hicks*, and *Stuart.*

*Clippinger*, 2023 U.S. Dist. LEXIS 153813, at n.8 (noting State Farm was required

to value autos "in line with a prescribed formula—that is, by market value, age, and

condition at the time of the loss"); *accord Reynolds*, 2024 U.S. Dist. LEXIS 63031,

at *15 (same). As in those cases, Plaintiff contests a discrete element—the PSA—

and makes a prima facie case by offering the Mitchell Report without the PSAs as

evidence of ACV determined by "market value, age, and condition," as prescribed

by Progressive's Policy. Absent class members could rely on that same evidence in

making a prima facie case were they to bring an individual action. So, these cases

support Plaintiff, not Progressive.

Finally, Progressive points to two outlier decisions, *Ambrosio v. Progressive*

*Preferred Ins. Co.*, 2024 U.S. Dist. LEXIS 36963 (D. Ariz. Mar. 4, 2024) and

*Kroeger v. Progressive Universal Ins. Co.*, No. 4:22-cv-00104-SHL-HCA, 2023

U.S. Dist. LEXIS 231824 (S.D. Iowa Nov. 20, 2023).[11] In *Ambrosio*, the court

started on firm ground: "[T]he crux of the issue here is whether Progressive breached

its obligation under the Policy to pay out the ACV of totaled vehicles by applying a

PSA." *Id*. at *22. It lost its footing in hypothesizing that "even if Plaintiffs

*established* the PSA was a policy violation, Progressive would still be entitled to

---

[11] Progressive tangentially cites *Tarrify Props., LLC v. Cuyahoga County*, 37 F.4th 1101, 1106 (6th Cir. 2022), IB at 42, which Plaintiff addressed in her Answer to Progressive's Petition. An. Br. at n.7.

present individualized evidence that it did not breach [the] contract." *Id.* at \*14 (emphasis added). That makes no sense. Evidence either establishes a policy violation (i.e., a breach) or not. And predominance asks whether plaintiffs have shown common evidence can be used to make out a prima facie case of liability. The *Ambrosio* court missed this. Perhaps that is why the Ninth Circuit quickly granted interlocutory review of this outlier decision. *Ambrosio v. Progressive Preferred Ins. Co.,* No. 24-1633, ECF No. 29 (9th Cir. Apr. 26,2024).

*Kroeger* is equally unpersuasive. Indeed, it is self-distinguishing, as it admits parting ways with the consensus because of "peculiarities of Iowa [and Eighth Circuit] law." *Reynolds*, 2024 U.S. Dist. LEXIS 63031, at \*37; *accord Curran*, 2023 U.S. Dist. LEXIS 224952, at \*n.9. Also, *Kroeger*'s interpretation of the Eighth Circuit cases it purported to follow was questionable, putting it mildly. While *Kroeger* thought *LaBrier* and *Stuart* compelled it to deny class certification, the *Reynolds* court found "these same cases persuade the Court all the more that class issues do, in fact, predominate here." 2024 U.S. Dist. LEXIS 63031, at \*38. It was no abuse of discretion to side with *Reynolds* rather than *Kroeger*. Indeed, *Reynolds*— and the eight other courts to grant certification, including *Chadwick*, a court within the Eighth Circuit decided after *Kroeger*—got it right. Certainly, it was not an abuse of discretion to join the majority consensus in finding class treatment is appropriate.

e. **The district court did not abuse its discretion in finding Progressive's manipulation and exclusion of data contributes to finding that**

37

**common issues are likely to predominate.**

Next, Progressive provides a convoluted, confusing argument that market value and ACV under its Policy are indistinguishable and the district court abused its discretion by focusing solely on the PSA. IB at 47-52. This argument(?) fails for numerous reasons.

*First*, Plaintiff presented evidence *not only* that application of the PSAs was wrong and violated the contract, *but also* that ACV is properly calculated by utilizing the Mitchell Reports after the PSAs are excised. *See Curran*, 2023 U.S. Dist. LEXIS 224952, at *8 (common questions predominate "not simply because Plaintiff wants a jury to conclude that the PSA does not represent ACV, but because Plaintiff wants a jury to conclude that omitting the PSA from each valuation produced by Mitchell *would* represent ACV"); *Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *11 (certification was appropriate because the plaintiffs "present[ed] common proof that the PSA is invalid under Progressive's policy and should not have been used in the total loss valuations. *On top of this*, they intend to present common proof of correctly calculated ACV—the Mitchell Report—to prove that class members were paid less than required under the policy[.]") (emphasis added). So, it is not the case that Plaintiff is *only* showing the PSA is illegitimate—she is also showing ACV is *properly* calculated by taking the average list/market price of comp vehicles,

adjusted for differences in condition, equipment, and mileage—in other words, the
Mitchell Reports, after excising the PSAs, constitutes ACV.

*Second*, Progressive's complaint that the district court focused on the PSAs is
odd. After all, that is the Parties' only dispute. All witnesses—Progressive's and
Plaintiff's—agree with Progressive's valuation except for the PSA. ECF No. 93-2 at
59-63, 83-85 (Retton Dep), at 58:7-62:19, 82:15-84:7, ECF No. 120-1 at 7-8 (Walker
Dep.), at 21:6-25:3; ECF No 119-1 (Kinney Dep.) at 74:21-75:04. Indeed,
Progressive's appraisal expert agreed the dispute at trial boils down to disagreement
about application of the PSAs. ECF No. 120 at 2-3. It is unsurprising—and certainly
not an abuse of discretion—that the district court focused on the Parties' actual
dispute.

*Third*, Progressive goes so far as to say the notion that "market value means
something different than ACV" is nothing more than "Plaintiff's theory." IB at 51.
What? The Policy states ACV will be "determined by" market value. Obviously, for
something to be "determined by" another requires that they be different things.
Otherwise, the Policy would read that ACV will be "determined by" ACV (or market
value will be "determined by" market value), which is nonsensical. The actual
difference is not difficult to understand: Market value is generic, while ACV is
specific. So, one must first identify the market value of, say, a 2020 Ford F150 in a
particular locale. Then, adjustments based on a *specific Ford F150* (condition,

mileage, etc.) are applied to determine that vehicle's specific ACV. Doing so means that (specific) ACV is "determined by" (general) market value. The only dispute between the parties concerns that first step. Plaintiff contends dealers price to market, and so list prices equate to market value—and they have presented evidence in support thereof through Felix's expert testimony, empirical DMV market data, JD Power's own data, and Merritt's expert testimony. Progressive claims that dealers price above market, and so a PSA must be applied to drive the price down to actual market value. As the Eighth Circuit explained in a case challenging application of PSAs in Mitchell reports, if Plaintiff is correct that the PSA is "contrary to industry practices and consumer experiences (and therefore not reflective of the vehicle's fair market value)," the insurer "did not consider the truck's fair market value; it considered an artificially lower value, in breach of its contractual duty[.]" *Smith*, 18 F.4th at 980–81.[12] If Progressive's view of the market is correct, Plaintiff's claims will fail along with those of all Class Members. Either way, it was not an abuse of discretion to find common issues are more likely than not to predominate, just as nine other courts did. If an abuse of discretion occurs only if "no reasonable person would agree with" that decision, *Thomas*, 453 F.3d at 845, how could nine jurists—

---

[12] Progressive suggests Plaintiff changed her theory on this point. IB at 49. Wrong again. Plaintiff made this precise point in her Motion, again in her Reply, an again in responding to the 23(f) petition.

across varied jurisdictions, with varied jurisprudential philosophies—come to the same conclusion?

*Fourth*, Progressive is wrong to suggest evidence demonstrating it breached the Policy by failing to "determine" ACV based on actual market value, but rather on an "artificially lower" and manipulated "market" of its own invention, means Plaintiff is abandoning the notion that its underpayment of ACV is subject to classwide proof. In fact, the two issues run together—Plaintiff's evidence would permit a reasonable jury to find both that Progressive did not "determine" ACV based on market value and (for pretty much the same reasons) that it underpaid ACV. *See* ECF No. 120 at 5-6. As the district court explained, "if the application of the PSA is found to be generally violative of Progressive's form policy, it would necessarily be based on a finding that application of the PSA results in a payment different from the [ACV] of the totaled vehicle." ECF No. 13, at 15 (quoting *Brown*, 2023 U.S. Dist. LEXIS 136472, at *4); *see also, e.g.*, *Curran*, 2023 U.S. Dist. LEXIS 224952, at *7 ("[T]he valuation of damages presents a common question not simply because Plaintiff wants a jury to conclude that the PSA does not represent ACV, but because Plaintiff wants a jury to conclude that omitting the PSA from each valuation…*would* represent ACV") (emphasis in original). So, Progressive is wrong to the extent it argues the court implied underpayment of ACV is not at issue. Indeed,

the PSA—unlike the condition adjustment at issue in *Lara*—is *always* a downward adjustment, so the two issues are inextricably linked.

*Fifth*, Progressive wrongly suggests Plaintiff "cannot show that Progressive breached its contractual duty to pay ACV" unless she presents evidence that the sold prices of comp vehicles utilized in her report exceeded the amount Progressive projected it would be by applying the PSAs. IB at 48-49. This is question begging. Plaintiff does not believe she has any such obligation. If Progressive is correct that failing to present such evidence means Plaintiff cannot prove a breach, then Plaintiff will fail to prove a breach (for herself, along with class members), because she is not presenting any such evidence. That has nothing to do with the appropriateness of class treatment. *See, e.g.*, *Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010) ("Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win.").

*Sixth*, Progressive argues that vehicle value, whether ACV or market value, "depends on all the same individualized evidence[.]" IB at 50. Right. "Individualized" things such as vehicle condition, mileage amount, various equipment, and so forth. Progressive has already identified and accounted for those individualized vehicle attributes, and all witnesses and parties agree its analysis is sound. It was not an abuse of discretion for the district court to conclude that such evidence in the form of the Mitchell Report can be used by Plaintiff at trial to

convince a jury her proposed ACV amount is correct—and, were they to bring an individual claim, absent class members could do the same.

In sum, as numerous courts have found, if a Plaintiff proves application of the PSAs constituted a breach, it would necessarily be because she proved application of the PSA resulted in payment of less than ACV. It was not an abuse of discretion for the district court to join with consensus authority and find Plaintiff proved common issues and common evidence are more likely than not to predominate.[13]

### f. Plaintiff was not required to prove that her evidence of ACV is the only evidence of ACV.

Finally, Progressive claims class certification should be reversed because even if Plaintiff's evidence of ACV is "admissible as evidence of ACV, Plaintiff has presented no evidence whatsoever that this is the *only* legitimate way to estimate ACV." IB at 53. In other words, Plaintiff cannot show class treatment is appropriate unless she shows her evidence of ACV is the *only* admissible evidence of ACV. IB at 53-55. So, according to Progressive, class treatment is inappropriate unless the

---

[13] Again, it is worth taking a step back. The scorecard is currently 10-3. It beggars belief that ten jurists came to a conclusion with which "no reasonable person would agree[.]" *Thomas*, 453 F.3d at 845. Even assuming the three minority rulings were reasonable, it would not follow that the ten rulings were therefore *un*reasonable. It could just be that reasonable minds differed. Although, of those three, the plaintiff only sought interlocutory review as to *Ambrosio*, which the Ninth Circuit quickly granted, so whether it is reasonable to *deny* class treatment is far more of an open question. Put bluntly, in an 10-3 jurisprudential scorecard, it is arguably the case the three are not unreasonable, just a minority. But in what universe are the *ten* the unreasonable ones?

claim can be resolved at summary judgment—after all, if Plaintiff demonstrated her evidence of ACV is the *only* evidence of ACV, she would necessarily be entitled to summary judgment.

That is not the law. Class claims go to juries all the time. To be sure, the question relevant to class treatment is not whether there is *one way* to resolve the evidence; the question is whether absent class members could rely on Plaintiffs' evidence to make a prima facie case. Indeed, part of the policy justification for Rule 23 is that it is preferable to treat like people alike *precisely to avoid* a situation where multiple juries look at essentially identical facts and comes to different conclusions. Obviously, this assumes a jury *could* look at the same facts and reasonably come to different conclusions—otherwise, the case never would have made it to a jury.

The cases Progressive cites do not suggest otherwise. Again, in *Sampson*, the plaintiff's theory was that the insurance company's breach was not in the amount that it paid, but in the company it selected to come to that amount. 83 F.4th at 420. The Fifth Circuit explained that assuming that were true, if *any* of the vendors the plaintiffs believed would have been acceptable provided a value lower than USAA had, the "insureds 'are unharmed' as a matter of law under plaintiffs' theory." *Id*. That is nothing like the theory of liability here, which is why numerous courts have distinguished it—here, Plaintiff claims not that Progressive breached the contract by using Mitchell as a vendor, but by underpaying ACV as a factual matter through

application of the PSAs. So, it would do Progressive no good to show that they could have legally used a different vendor, because Plaintiff is not even claiming Mitchell was an unacceptable vendor. Rather, Plaintiff has presented evidence that Progressive breached its contract as a *factual* matter by underpaying ACV and failing to determine ACV based on market value, age, and condition. So, the question is merely whether absent class members could rely on that evidence were they to bring an individual case—and it was not an abuse of discretion for the district court to find it is more than likely that the answer is "yes."

More to the point, Progressive has not identified a single piece of evidence demonstrating that even assuming it breached its contract (just as the Fifth Circuit assumed the *Sampson* defendant breached its contract), it could have complied with its contract while still paying the exact same amount as ACV or even less (just as the *Sampson* defendant could have complied with its contract by using a valid "source" that was equal to or even less than the ACV amount it paid). Nor could it, given that Plaintiff's claim is not that Progressive breached the contract by using an invalid source, but that it underpaid ACV as a factual matter. The only "source" Progressive points to is NADA. IB at 55. But Plaintiff argues that to use NADA would have constituted a breach of contract, and thus it is not a valid defense. ECF No. 120 at 9-10. As the *Volino* court pointed out, that dispute is itself subject to resolution on a classwide basis—after all, because the Policy language is identical

as to all class members, if NADA is inconsistent with the words of the Policy, that would be true as to every insured, all of whom agreed to the exact same Policy language.[14] So, *Sampson* is inapposite here both as a theoretical and as an evidentiary matter.

*Lara* is perhaps even more obviously distinguishable on this point. As Progressive points out, the Ninth Circuit held that even if some of the evidence was common, much of it wouldn't be. IB at 53 (citing *Lara*). That was because whether the condition adjustment was properly itemized was based on common evidence, but whether it was accurate in amount (and thus a breach of contract) was not. After all, to know whether an insurance company properly assessed the condition of a vehicle requires, well, assessing the condition of the vehicle. And there was no evidence in *Lara* that the condition adjustments were systemically weighed against the insureds. Here, there is no dispute over whether Progressive properly assessed the condition of vehicles, and thus no dispute for a jury to resolve. *See supra.* So, there will be no individualized evidence on that point—certainly, Progressive has pointed to none. And to the extent Progressive it suggesting it *may* have gotten the uncontested parts of its valuations wrong, "arguments woven entirely out of gossamer strands of

---

[14] This question likely cannot even get to the jury, because the evidence is undisputed that, inter alia, NADA guidebook values are not "determined by" market value, as required by Progressive's Policy, but rather based on broad, multi-state geographic regions. On this point, Progressive's witnesses agree, Plaintiffs' witnesses agree, and NADA itself agrees. ECF No. 120 at 8–9.

speculation and surmise" do not preclude class treatment. *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 299 (1st Cir. 2000); *accord Volino*, 2023 U.S. Dist. LEXIS 44666, at *9 ("[N]one of the[se] issues . . . would undermine Plaintiffs' common proof of ACV, even if they were based on more than speculation[.]"); *Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *14 (finding the same argument rests "on speculation, which holds no truck with class certification")

Said another way, it may very well have been the case that, in *Lara*, "much of the evidence" would not have been common to the class. But that is irrelevant to whether in this case, which presents a different theory and different record, "much of the evidence" is likely to be common to the class. That is because "[o]ther cases presenting different allegations and different records may lead to different conclusions." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 507 (2023) (Jackson, J., concurring). Based on the record presented to it, the district court's conclusion that common issues were likely to predominate is not one with which "no reasonable person" could agree. To the contrary, it was a conclusion with which nine jurists have agreed.

## II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THERE WERE COMMON QUESTIONS WITHIN THE MEANING OF RULE 23(A)(2)

Progressive also argues the "legitimacy" of the PSA is not a common question at all—but, perhaps recognizing the potency of the abuse of discretion standard,

attempts to argue the error was in failing to properly apply the "rigorous analysis" standard. IB at 55-62. As an initial matter, the district court did not fail to apply a rigorous analysis. As this Court recently explained in *Eddlemon*, 65 F.4th 335, to engage in a rigorous analysis, courts (i) cannot accept the pleadings, but rather must be satisfied the representative demonstrated the Rule 23 elements are met in fact, and (ii) cannot accept proposed common questions "without referring to the common evidence presented to answer those questions." *Id*. at 338-39. Clearly, the district court did so, pointing to evidence—declarations, expert reports, Progressive's documents—to support the Rule 23 elements, not allegations. Order, at 12-22. The court noted the answer to the common questions would be supplied by expert testimony on the used auto market, appraisal standards, and empirical evidence from Progressive and the DMV market data. *Id*. at 3-7, 13. Progressive's complaint, properly understood, is the district court was "satisfied" the Rule 23 elements were met based on the evidence presented and that common questions would be answered based on common evidence, not that it failed to apply a "rigorous analysis" and instead relied on allegations. But how a district court weighs evidence is subject to abuse of discretion review—and it was not an abuse of discretion for the district court to weigh the evidence precisely how most other judges have done so.

Moreover, Progressive's argument on this point is muddled and relies, again, on a strawman rather than Plaintiff's claims. For example, Plaintiff claims that

because the PSAs are based on manipulated, truncated data, Progressive breached

its contract by "determining" ACV not based on the actual market, but rather on a

false, artificial "market" of its own imagination. Yet, Progressive asserts because

"the contract does not require a specific methodology for calculating ACV…the

'legitimacy' of PSAs is irrelevant to whether Progressive has violated [its] policy."

IB at 57. This is wrong: As previously mentioned, Progressive's Policy explicitly

prescribes the "methodology" for determining ACV, namely that it must be

determined by market value, age, and condition. *Clippinger*, 2023 U.S. Dist. LEXIS

153813, at n.8; *Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *15. To the extent that

by "methodology," Progressive means the vendor it used, Plaintiff has no quarrel

with using Mitchell. Plaintiff's point is that whatever vendor Progressive selects, it

must *use* that vendor to properly pay ACV and determine it based on market value,

age, and condition. Frankly, framing this as a "methodology" debate is a misnomer.

As the Eighth Circuit explained, *Smith*, 18 F.4th at 980–81, if Progressive's view of

the market is correct, its application of the PSAs was consistent with its obligation

to "determine" ACV based on market value, and there was no breach. If Plaintiff's

view of the market is correct, then application of the PSAs was inconsistent with

such obligation, and there *was* a breach. That is the core question in this litigation,

and the district court did not abuse its discretion in finding such question is more

likely than not subject to a common answer. Once again, Progressive is simply trying to change the subject.

Further muddying the water, Progressive asserts the PSAs are "intended to predict the price for which a used car will actually sell" and that an analysis of JD Power's truncated, manipulated data shows that the PSA inaccurately predicts sale prices, but only by an average of about $70.00. IB at 58-59. First, so what? For purposes of class certification, such argument is irrelevant. Plaintiff is not presenting evidence that the comp vehicles utilized in her own Report sold for more than Progressive "projected" they would. If doing so is necessary to prove a breach, her claim will fail on its merits, along with those of all Class Members.[15] And as this Court has explained, "Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win." *Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010); *accord In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 681-82 (N.D. Ga. 2016) ("At this stage, the inquiry is whether a proposed class

---

[15] Indeed, Progressive explicitly argues that, to prevail in showing it breaches its contract, Plaintiff would need to present evidence that "list prices *always* reflect market values and that dealers *never* negotiate[.]" IB at 60. Well, Plaintiff disagrees for many reasons discussed herein, including that, as the Eleventh Circuit explained, it is almost certainly the case, based on basic economic principles, that sometimes consumers who happen to be savvy, atypical negotiators can secure a below-market deal. *Signor*, 72 F.4th at 1231. But even if Progressive is correct and articulated the correct standard, that would only mean Plaintiff will lose, because she is not attempting to present such evidence to prove her *own* claim, let alone class members'.

exhibits some fatal *dissimilarity*. Whether the class exhibits some fatal *similarity*—a failure of proof as to all class members on an element of their claim—is properly engaged as a matter of summary judgment") (cleaned up). Second, the "analysis" Progressive references is laughable. Progressive's expert took a sample of JD Power's already manipulated, truncated data, and found that, on balance, the PSA was only off by about $70.00. ECF No. 120 at 8 at n.2. *Of course* a subset of the manipulated data is somewhat consistent with the manipulated data. That isn't the question. The question is whether the data should have been manipulated in the first place. (The answer is "no.") At the very least, it was not an abuse of discretion for the district court to conclude that the general accuracy of the PSA based on an analysis of a subset of manipulated data does not indicate individualized issues are likely to predominate.

Progressive also argues that even if the PSA is illegitimate, that would not establish a breach, because whether Progressive underpaid ACV "depends on the facts and circumstances of that class member's individual valuation and vehicle." IB at 62. But the Parties have no quarrel with any aspect of the valuation other than application of the PSA. So, while valuing used autos and calculating ACV may very well be an individual process, it is not an individualized issue *in this litigation* because it has already occurred, and, as such, it does not preclude class treatment.

Moreover, this Court is not working from a blank slate. At the very least, it was not an abuse of discretion for the district court to weigh the evidence and find that whether application of the PSAs constituted a breach of Progressive's duty to "determine" ACV based on market value is subject to a common answer. Progressive never presented any evidence that aspects of the Mitchell Report other than the PSA is flawed and thus Mitchell Reports need to be reevaluated in their entirety. Instead, all the evidence—Plaintiff's and Progressive's—is that the Mitchell Report's (individual) assessment of vehicle value *other than the PSA* is sound. So, the only question is whether the PSA itself is sound, which turns on common evidence concerning the used auto market. Do list prices equate to market value (as Plaintiff contends) or are they above market value (as Progressive contends)? It was not an abuse of discretion for the district court to, after weighing the evidence, agree with ten out of thirteen courts in finding the answer to that question will be predominantly based on common evidence.

## III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THERE ARE NO DISQUALIFYING INTRACLASS CONFLICTS

The district court correctly held Plaintiff is adequate and there are no intraclass conflicts precluding certification. Progressive's arguments—that some class members "benefitted" from application of the PSA deductions and some are subject

to a "peculiar" defense relating to an alternate valuation method endorsed only by Progressive's lawyers—are misguided and wrong.

To be adequate under Rule 23(a)(4), a class representative must not have "antagonistic or conflicting claims." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993). The arguable existence of a conflict "alone will not, however, necessarily defeat class certification—the conflict must be 'fundamental.'" *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (quoting *Wal-Mart Stores, Inc. v. Visa USA Inc.*, 280 F.3d 124, 145 (2d Cir. 2001)). A fundamental conflict is one where if the plaintiff prevails on his or her claim, some class members would benefit while, simultaneously, others would be harmed. *See, e.g.*, *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).

Progressive has identified *no* conflict, much less a fundamental one. The suggestion that some members "benefitted" from application of the PSAs, and thus would be harmed if Plaintiff prevails and the PSAs are excised from the valuation reports, is flat wrong. After all, the PSAs are *always* a downward adjustment. So, if Plaintiff prevails, "all class members would receive more." Order, at 19. Four other courts also rejected this "specious" argument. *See Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *25–*26 ("Yes, Progressive could have harmed members more had it used some other method of determining ACV. But the possibility of greater harm [] does

53

not imply a reciprocal benefit from using the PSA; relative privation is still privation.").[16]

Moreover, the district court was well within its discretion, based on the *evidence*, in granting certification over Progressive's counsel's unsupported arguments that Progressive *could have* paid Plaintiff or class members less under the NADA guidebook standard. All parties—Progressive and its experts, Plaintiff and her experts, NADA and KBB representatives, the Fifth Circuit—agree that NADA and KBB guidebook values do not constitute a valid ACV based on "market value, age, and condition" of a specific vehicle. ECF No. 120 at 9-10. If Progressive had based its ACV payments on NADA or KBB guidebook values, that would have simply constituted a different breach. *See id.* Progressive's incorrect speculation that some class members may have somehow "benefitted" from application of the PSA is clearly wrong—and, at the very least, it fails to establish a fundamental conflict. *See Johnson v. Meriter Health Servs. Emple. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012) (finding "hypothetical . . . contention that some class members will be hurt by class treatment" did not present legitimate conflict).[17]

---

[16] *See also Freeman*, 2024 U.S. Dist. LEXIS 83402, at \*46–\*48; *Drummond*, 2023 U.S. Dist. LEXIS 140205, at \*28–\*30; *Brown*, 2023 U.S. Dist. LEXIS 136472, at \*12–\*13.

[17] Plaintiff addresses the irrelevance of *Prudhomme v. GEICO*, 2022 U.S. App. LEXIS 4599 (5th Cir. Feb. 21, 2022), in her Reply brief. ECF No. 120 at 15–16.

Progressive's other adequacy arguments fare no better. Progressive baldly claims it could have paid Plaintiff less if it had cherry-picked four of the thirteen vehicles included in her WCTL Report. IB at 65. First, this argument was not raised to the district court, so it is waived. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("It is a well-established rule that arguments not raised to the district court are waived on appeal."). Moreover, Progressive cites no support in the record that it could have *actually* valued Plaintiff's vehicle in this way—it is instead supported only by cursory arguments from counsel. *See id.*[18]

Finally, Progressive's argument related to supposed "gratuitous" payments for storage fees and related to a prior partial loss fall flat. These have no bearing on class certification. *See* ECF No. 120 at 17-18. Plaintiff is "part of the class and possess[es] the same interest and suffer[ed] the same injury as the class members;" and is therefore adequate. *See Conrad v. Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017). The issues raised suggest, at most, that Progressive will seek a setoff of damages— but "the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *See Messner*, 669 F.3d at 815.

## CONCLUSION

For these reasons, the Order granting class certification should be affirmed.

---

[18] Indeed, Progressive's expert witnesses do not advocate this valuation method. And even if there were support for this contention, the possibility that some class members "would have received even less" under this never-before-seen valuation method does "not render irrelevant the fact that the PSA *certainly* resulted in a reduction." *See Brown*, 2023 U.S. Dist. LEXIS 136472, at *13.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c) because it contains 13,991 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirement of the Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word with 14-point Times New Roman font, a proportionally spaced typeface.

Date: July 22, 2024

/s/Jacob L. Phillips
Jacob L. Phillips

*Counsel for the Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby that on July 22, 2024 the foregoing document was filed with the

United States Court of Appeals for the Seventh Circuit through the CM/ECF

system. I further certify that I have served a copy of the foregoing document via a

third-party commercial carrier upon the following counsel:

Paul Alessio Mezzina
Amy R. Upshaw
Christine Carletta
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006

Julia C. Barrett
KING & SPALDING LLP
500 West 2nd Street, Ste. 1800
Austin, TX 78701

Nicole Bronnimann
KING & SPALDING LLP
1100 Louisiana Street, Ste. 4100
Houston, TX 77002
jcashdan@kslaw.com

Jeffrey S. Cashdan
Zachary A. McEntyre
James Matthew Brigman
Allison Hill White
Erin Munger
KING & SPALDING LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309
(404) 572-4600
jcashdan@kslaw.com

*/s/ Jacob Phillips*
Jacob Phillips
*Counsel for Respondent*